So let's begin with our first case on the call this morning and that is agenda number four, number 127223, People of the State of Illinois v. Michael Pinkett. Counsel for the appellant, are you prepared to proceed? We will begin and please identify yourself. Good morning, may it please the court, counsel. I'm Assistant Attorney General Josh Schneider on behalf of the people of the state of Illinois. This court should reverse the judgment of the appellate court because the evidence that defendant did not say anything when a man in a T-shirt and shorts grabbed him from behind as he was leaving a Walmart bathroom was properly admitted under both the Fifth Amendment and under Illinois law, and therefore the prosecutor's comment on that evidence in opening statement and in closing argument was also proper. In the alternative, the court should reverse the appellate court's judgment because any error, any of the admission of that evidence or the comment upon that evidence was harmless given the overwhelming guilt or overwhelming evidence of defendant's guilt. Starting with the question of the constitutional admissibility of this evidence, evidence of a defendant's silence, like evidence of defendant's statements, are admissible under the Fifth Amendment as long as it was not compelled in some way by the state. And that's because what the Fifth Amendment does under the self-incrimination clause is it provides a privilege against compulsory self-incrimination, meaning that a person has a privilege not to answer questions put to them by the government if those answers may be incriminating. What the Fifth Amendment does not do is create a general privilege against the use of one's silence in evidence at trial regardless of the reasons that the person kept silent and regardless of the circumstances under which they kept silent. Counsel, is pre-Miranda silence ever relevant to guilt? Yes, Your Honor, and we would suggest that this is a good example of when pre-Miranda silence is relevant to guilt. But to take a step back from these facts and just give you a hypothetical, if I was arrested before I'm Mirandized, the police come, they handcuff me and say, you're under arrest for killing Doug. And my wife says, oh, my God, you killed Doug. How could you do that? I don't say anything. That silence was neither compelled by the state nor is it irrelevant to my guilt, because a person under that circumstance would normally deny that they've killed Doug if their spouse accused them. This Court in cases like Augenbach said that, for example, a tacit admission doctrine says that if a person is silent under circumstances where they've been accused of a crime and a person would ordinarily, if not guilty, have denied it, that silence is admissible. But the Supreme Court in Brecht v. Abrams also found that silence is probative. The reason that silence is not probative or sufficiently probative after Miranda is that silence after the Miranda warning has been given, has been induced by the state, by giving the Miranda warning, by telling someone in custody before you interrogate them that the person has the right to remain silent. What about in this situation where the person went in, announced that he was a police officer, and said, don't make a scene as we walk out of here? So weren't they inducing a silence by saying, don't make a scene? No, and for a factual reason. It's important to remember that the silence that we're talking about in this case is only a couple of seconds, because what happened was Deputy Frazier goes into the bathroom in his T-shirt and shorts. He doesn't say anything. The defendant is in there looking nervous. He then walks out. As he walks out, Deputy Frazier grabs him from behind, disarms him, and says, I'm Deputy Frazier, come with me, don't make a scene. At that point, once they've left the bathroom, defendant does not, in fact, remain silent. He says all kinds of things. He asks questions. Excuse me, counsel, didn't he say keep your mouth shut? Your Honor, I don't understand that to be what he said in the record. This is on cross-examination on page supplemental report of proceedings 277. During cross-examination, Deputy Frazier is asked a compound question, and you told him not to make a scene, keep his mouth shut, walked him out the door, and Frazier simply says yes. But even if we say, even if he did say keep your mouth shut, apparently that was not sufficient to compel him to be silent because he then asked questions, made all kinds of statements between the bathroom and the front of the store, and then made more statements from leaving the store until he was arrived at the police station, and then made more statements after he was then Mirandized until he eventually asked for counsel, and they cut off all questioning. Counsel, what about the person who's familiar with the Miranda warning and does not make a statement? So the thing that's important to remember about the Fifth Amendment privilege is that it is only the privilege against compelled of self-incrimination. And so in order to invoke that privilege, the Supreme Court has been very clear that you need to unambiguously invoke it. And simply being quiet in the face of arrest is not an invocation of that right. And so in order to invoke that privilege, the Supreme Court has been very clear about the Miranda articulation of the right. It's important to remember that the idea that the Fifth Amendment privilege creates a sort of generalized shield against any sort of silence being admissible under any circumstances is based on that Miranda articulation of the right. But that articulation of the right is designed for a very specific purpose. Miranda created a prophylactic rule to protect the privilege in the context of custodial interrogations. What the Miranda court recognized is that in that context, the combination of the police-dominated custodial environment together with the pressure of professional questioning techniques was inherently coercive. And so to protect someone against that coercive force where the person under those circumstances might not know that they have the right not to answer those questions from the government or might not believe that they have that right under those circumstances is to tell them that they have the privilege not to answer questions from the government. And the reason that it's phrased, the right to remain silent, is because we're communicating that right to a layperson under stressful circumstances. And that is the clearest way to tell the person, you don't have to say anything. But it does not actually change the contours of the right under the Fifth Amendment. There is no generalized right to remain silent. And that's actually why the Miranda warning has no application outside of the context of custodial interrogation. Would we get a different result under the Illinois Constitution? The Fifth Amendment says nor shall be compelled in any case to be a witness. But our Constitution provides in a criminal case to give evidence. It doesn't say be compelled. But if you give evidence, it's a violation. Your Honor, my end, and maybe I embarrass if I'm wrong, my recollection was that the Fifth Amendment says no person shall be compelled to give evidence. Right. So compelled to give evidence or compelled to be a witness against himself. But the key part of both of those for the purposes of the self-incrimination clause is the word compelled. And that's identical. This Court has recognized that the compulsory self-incrimination clause of Article 1, Section 10 and the compulsory self-incrimination clause of the Fifth Amendment are coextensive. And that's why they're construed in lockstep. Well, the point I was trying to get at is the Fifth Amendment talks about to be a witness. And our Constitution, Article 1, Section 10, just talks about giving evidence. That's true. And this Court has recognized that that difference, I believe it was in Hanrahan, the Court said that difference is semantic, not substantive. That's why the Court, I believe it was in Rolfingsmeier, said this language is virtually identical. And then this Court in Rolso-Lalo said that that's why these two provisions are construed in lockstep, is that it is evident from the Constitutional Convention, which this Court reviewed the transcript of that convention and said from that convention it's clear that there is no basis to believe that the drafters of the 1970 Constitution intended any difference between the protections under Article 1, Section 10 and the Fifth Amendment. So this Court has construed those provisions in lockstep. And the only basis on which this Court has departed from lockstep in these sorts of circumstances is where either something in the plain language of the provision shows that it's intended to provide different protections. And this Court has already held several times that it does not. Or if Illinois has a longstanding, well-established tradition of providing greater protections, and there is no basis to find that Illinois provides a longstanding constitutional protection of noncompelled silence from being admitted. Now, defendant cites Needy from 1924. But in Needy, the silence was admissible. The Court said specifically the silence was properly submitted to the jury. It's just the jury should have been instructed that it should give it the appropriate weight based on the circumstances and nature of that evidence. What the Court in Needy held was that evidence of silence cannot be used as the entirety of the evidence of guilt, absent any other evidence. In that case, I believe it was someone who only spoke Italian. She was in custody. A co-defendant was giving a statement in English that implicated her. And there was no evidence she even understood what that person was saying. And the State offered her silence in the face of that English statement by a co-defendant as the entirety of the evidence of her guilt. And this Court in Needy said, well, you can't do that. It can't be taken as a confession. It can merely be taken as some evidence relevant probative of guilt depending on the circumstances, which is all that is currently the case under Illinois law. Under Illinois law now, evidence of silence is not categorically inadmissible, but that doesn't mean that it's admissible. In the vast majority of cases, it is not admissible, but not for constitutional reasons. The Constitution only excludes compelled silence. Other silence, noncompelled silence in the face of arrest is inadmissible for a different reason in most cases, and that's simply the normal functioning of our rules of evidence under Rule 403, because the evidence of silence during and after arrest in the vast majority of cases is almost – has very little probative value and poses a substantial risk of unfair prejudice. And the reason for that is the vast majority of arrests are by an officer who is wielding in some way a symbol of his office. So if someone is arrested by an officer in uniform or is arrested by an officer in plainclothes, but they show their badge when they affect the arrest, under those circumstances, yes, it supports a weak inference if the person does not decry their innocence when they're arrested, but that is a very weak inference, and it is equally, if not more plausible, that the reason the person is not saying anything is for all the reasons that the defendant argued in closing here, that he was trying to comply, he was trying not to give the officers any trouble, he was going out of his way to submit to the assertion of authority from the officer. Kennedy. Counsel, why is that not the case here? I mean, he was basically arrested with a knife, wasn't he? Well, he was arrested while carrying a knife. But again, the silence that we're talking about here is not the silence after Deputy Frazier identified himself as a deputy, because he wasn't silent after Deputy Frazier identified himself as a deputy. He was silent before Deputy Frazier identified himself. So what we're really talking about is the silence of someone who is in a bathroom. They walk past a man wearing a T-shirt and shorts with no indication that person is a police officer. That person grabs them from behind as they're leaving, and they have no response. And the question is, is that silence in the context of these, the preceding facts and the subsequent statements, sufficiently relevant to overcome the risk of unfair prejudice? And we would submit it is. That is entirely consistent with someone who so anticipates apprehension by law enforcement, that they assume anyone who grabs them has a lawful right to do so. When any ordinary person, if they're accosted physically in the bathroom, would have some kind of response. And that's actually. Would you say that that was like one or two seconds at most? It sounds like it was the space of the time between when he was grabbed and after and when Deputy Frazier said, I'm a deputy. Because then they're leaving the bathroom, and defendant asks, how do I know that you're a police officer? Deputy Frazier admits that he has no way to prove it, because he's not just plain clothes. He's totally off the clock. He doesn't have a badge. He doesn't have handcuffs. So he says, well, we can go up to the front. There's an officer there who's in uniform. He continues to make statements. He says that. But what I'm talking about is when he grabs them from behind, that is literally, what, a second, two seconds? I mean, and all of this discussion in opening up references something that might have just been a shock or stunning to him, because the identification and the taking of the weapon, all of that happens almost instantaneously. That's certainly true. The question, though, under Rule 403 is not, is there any other understanding of what happened here? The question is, is it probative, meaning is it relevant? Can it be supporting inference of consciousness of guilt? And it certainly can here. And on the other side is the risk of unfair prejudice. So, for example, in the normal arrest, the risk of unfair prejudice is exactly the risk that Justice McGill identified, which is, well, what if the person is operating under the sort of popular misconception of the Fifth Amendment privilege as just, I have a right not to say anything, and that can never be used against me? If a person's arrested by a uniformed officer, that person's silence could very well be them going, oh, I know I have a right to remain silent. I've watched law and order, and I know that I don't have to say anything, so I'm not going to say anything. And so introducing evidence of that silence, although it's weakly probative, is too risky. It's too likely for the jury to misuse it, to overly rely on it as an admission of guilt in the way that it was in NITI. But the risk that the jury will not construe it as, oh, the person was just really surprised, or the person was, you know, in the middle of a coughing fit at the time or whatever, whatever other innocent explanation is not a risk of unfair prejudice. It's just a risk that the jury will construe it as evidence of consciousness of guilt rather than innocently. And that's, most evidence is going to have sort of a double-edged sword. Did they mean this, or did they mean that? We leave that for the jury. What you've argued here is that there was some relevance under Supreme Court Rule 401, Rules of Evidence, there's some relevance to this testimony that for a few seconds the defendant here said nothing. And, in fact, that's what was argued. You can infer from the fact he said nothing in those seconds that he was, in fact, guilty, basically. And then you admitted, of course, that we had this balancing test under 403. Is it more prejudicial than probative? And we can debate that, whether it's weakly probative or not. Was there an objection made on that ground? There was no objection to the admission of the evidence, and there was no objection to the comment on the evidence in closing argument. So the only preserved claim is the claim that the comment on that evidence in opening, which was a single line, it was an abusive discretion not to declare a mistrial based on that single line. It was not an abusive discretion to deny a mistrial based on that single line. The court had already instructed the jury that opening, and subsequently I believe instructed the jury that opening statements are not evidence. It was a single line in a lengthy opening argument. And, in fact, as it turns out, it was not accurate, because I believe the line was that both officers would testify he never asked why he was being detained, and the actual testimony was only that Frazier testified that when he detained him, he did not ask why he was being detained. So it had minimal effect on the outcome of the trial. It certainly did not render the trial so fundamentally unfair that it would be futile to even bother continuing with the trial. It was not an abusive discretion to find that it was not that prejudicial. For the other claims, for the claim that the evidence was improperly admitted and the claim that the evidence was improperly commented on in closing argument, those were forfeited, and so they were reviewed for first prong plain error, where a defendant has also argued ineffective assistance of counsel. But even if the Court finds that those statements were improperly admitted and, therefore, the comment in closing argument was improper, it certainly was not first prong plain error. The evidence was not so closely balanced that any error, no matter how minimal the prejudice could have affected the outcome. Here, the evidence was absolutely overwhelming. I want to take you off in a different direction. Assuming that it was error, why wasn't this harmless? You know, there was a lot of other facts from which the guilt could have been concluded other than the few seconds of silence. So tell me why you think this wasn't harmless, assuming that it was error. Oh, no, Your Honor, we believe that it was entirely harmless, under any standard the Court would care to apply. The evidence showed that he led police in a high-speed chase for over 10 minutes, over 10 miles, speed going up to 90 miles an hour. He was pursued from distances of between a few car lengths to a couple hundred feet by more than one car, police car, with their lights flashing, their sirens blaring. His suggestion that perhaps he did not know that he was being pursued for that pace is simply beggar's belief. Anyone who's been within a quarter mile of a police car with their sirens going knows that they are deafening. Is that also true if you have earplugs and you don't have any rear-view mirror? So his suggestion that perhaps he was wearing earplugs, because on the video there's something hanging around his neck, is not sufficient to make this evidence closely balanced. We don't know what it was. But even if you have earplugs, anyone who's been – we know that these sirens were audible from about a mile away because when Officer Hobbs turned on her camera, it took 53 seconds for that 60-mile-an-hour pursuit to get to her. And she turned it on when she heard the sirens. So his argument is that because he has a helmet on and because the air was whooshing and speculation that perhaps he had earplugs or earphones on of some kind, that he therefore could not hear the siren that was audible a mile away is incredible. And then when we look at what he did after, when he got some distance after he passed that car at 90-plus, he then pulls into the Walmart parking lot at high speed, hides behind the building until the pursuing cars pass, then parks his motorcycle on the side, goes inside, and stays in the bathroom until he's apprehended by police. That is wholly inconsistent with his theory of, well, I had no idea it was being pursued. I just went inside to buy zip ties. I accelerated to 90 miles an hour because I remembered that I needed to repair this motorcycle. And there was, of course, no evidence to support that theory. That was entirely argument in closing. There was no evidence presented by the defendant at all. And for those reasons and the reasons in our brief, we ask that the Court reverse the judgment of the appellate court. Thank you. Thank you, Counsel. Counsel for the appellee. Good morning, and may it please the Court. My name is Sarah Lucey from the Office of the State Appellate Defender, on behalf of the appellee, Michael Pinkett. This Court has long held that it will decide a case on non-constitutional grounds if, indeed, there are sufficient non-constitutional grounds for a resolution of the case and will not reach a constitutional issue unless necessary. In this case, the Fourth District decided this court based on almost 90 years of Illinois evidentiary law that has been upheld by every single district as well as this court. There is no reason in this case for the court to deviate from that precedent and to reach a constitutional issue when this court and every court in the district has decided that a defendant's post-arrest, pre-Miranda silence is inadmissible in the State's case-in-chief and is only admissible in the very narrow circumstance when a defendant testifies in a way that is manifestly inconsistent with his silence. This Court has held under Illinois evidentiary law that silence is neither material nor relevant, language that speaks to Rule 401. So while the State would jump immediately to Rule 403 and have this court go into a balancing test, there is no need for this court to go that far. And this case, indeed, shows why that silence is not material. Indeed, Mr. Pinkett left the bathroom and shortly thereafter was detained, had his knife taken away, and immediately had the deputy say, I am a deputy sheriff. Don't make a scene. Come with me. When on cross-examination, defense counsel asked, did you tell him to keep his mouth shut? The police officer agreed with that statement, saying it accurately represented what he was communicating to Mr. Pinkett. His brief momentary silence following his arrest was not material or relevant and had no tendency to prove or disprove the charge against him. Indeed, the opening statement at issue here shows that the silence was not the pre-arrest silence, but was, in fact, the silence that came after the arrest when the State said the officers both will testify in spite of the fact that they tried to arrest him here at Walmart without making a scene, since it's in the middle of the store. At no point did he ever in any way ask the reason why he was being detained. The jury had no choice at that moment but to hear the implication that the State fully intended them to hear, which is he is guilty because he was silent. When the silence, in fact, was no more probative. Counsel, I want to ask you the same question. Why isn't that harmless error? Yes, Your Honor. It is absolutely not harmless. The Fourth District, two brilliant minds of the Fourth District, have already found that this error is not harmless. The State would like to rely on the fact that he went at 90 miles an hour at one point. The only time at which he sped up to that significant of a speed was to pass a gray SUV on these highway roads. So are you saying that the only thing that the prior effect could rely on was this moment of silence? Weren't there other factors that were sufficient to establish guilt? Not to establish guilt, Your Honor, and under the standard for an evidentiary the moment of silence, that was the only thing on which the guilt was found? Your Honor, I believe that would have been the nail that tipped the scales, as it were, the straw that tipped the scales. How do you know that? Because the evidence is far from overwhelming. As this Court sort of hinted at earlier, he was wearing earphones. He had a face mask that went over his ears. He was wearing a helmet. He was on top of what the officer described as a crotch rocket. And behind him were two Harley Davidsons, which the police officer also testified are specifically designed to be loud. He never looked behind him to see if there were any police officers. He did not have rearview mirrors. He said to the officers when he was being interrogated that he did not see the approaching lights from Officer Wessel's car, because he was either looking at his console, he was admiring the view. He did not see them as the lights came towards him. How many miles did this pursuit take cover? Thirteen miles, including a stop sign where all three motorcycles came to a complete stop, looked both ways, even though there's no indication in the record that there was any cross traffic. Officer Wessel didn't say the three motorcycles had to stop because a truck was passing from the other direction. It seems that all three came to a complete stop, observed the traffic, and decided to proceed. Proceeded at a fairly regular, slightly above the speed limit rate, followed a gray SUV for about a mile at whatever speed that gray SUV was going, before deciding, eh, that's too slow, we're going to pass it. And then they did the maneuver where they pulled into the oncoming traffic lane, sped up, because that's dangerous to stay in there, and pulled in front of the gray SUV. Michael Pinkett then turned into a Walmart, which is consistent with the officer's testimony that he had a piece of something dragging at the bottom of his motorcycle. And while the state would make a big deal of the fact that he went behind the Walmart, I would point out that the testimony is that he came into that parking lot at a high rate of speed. I am personally not a motorcycle rider. However, I have been assured that it is very dangerous to slam on the brakes, much in the same principle as a bicycle, which I'm more familiar with, as you can go over the handlebars and cause significant injury. If this Walmart parking lot was anything like every Walmart parking lot I have ever been in in my entire life, it was busy. There would have been cars and pedestrians and... Of course, we don't know any of that. That's not in the record. Of course, Your Honor. Maybe I'm going to ask the state the same question. How did this all play out? So you have the state's evidence says there were all these cars chasing these motorcycles, all these police cars with lights and sirens, and yet suddenly two off-duty police officers in their shorts and T-shirts are the ones that apprehend the defendant in the bathroom. Do we know what happened? How does it – I don't understand. Understandable confusion, Your Honor. It is an interesting case. I believe that both Officers Wessel and Hobbs, which were the two following cars, they peeled off with the first car that stopped – sorry, motorcycle that stopped. That motorcycle stopped at a gas station. And so I believe that those two officers followed. Mr. Pinkett continued, went to Wal-Mart, where he perhaps tried to slow down. There were no police officers under the state's evidence. No officers followed him to the Wal-Mart. Correct. So when he pulls into the Wal-Mart, there are no officers behind him. There are no lights flashing, no sirens going. So at the time that he finally takes off his helmet... We don't have any evidence about that, right? We know that there were no officers in uniforms around. I believe there may have been a squad car, but, indeed, the people that went in... The squad car didn't go into the Wal-Mart to stop him. Correct, Your Honor. The people who testified, they were at home, off-duty, in their shorts and T-shirts, without badges or handcuffs. Suddenly, they're the ones that apprehend the defendant in the bathroom, correct? Correct, Your Honor. But just because he was wearing shorts and a T-shirt does not mean that Michael Pinkett was of any less of an obligation to be compliant with his commands. And, indeed, this would have happened almost simultaneously. It does not take a great amount of time to put someone's hands behind their back, take out their knife, and say, I'm a deputy, come with me, don't make a scene. This all would have been in the span of a few seconds as Mr. Pinkett stepped out of the bathroom.  Such that there was no reasonable probability that the jury would have acquitted the defendant. No reasonable probability that one juror would have sat in that jury room and said, I don't buy it. I do not think that he heard those sirens. He went into the Wal-Mart. He had his helmet. He had his vest. He made no attempt to hide that he was that motorcyclist. He was just simply there to buy zip ties and use the bathroom. And, indeed, that is what the Fourth District held. While there was a dissent, the majority of the Fourth District held that it was not harmless error and would have remanded for a new trial. So the opening statement itself was the error that needs to be remanded. However, even if this Court finds that it was not sufficient alone, the error was compounded again and again when the State adduced this evidence during its case in chief from Officer Frazier and then used it significantly in its closing statement, saying, accusing Mr. Pinkett of not saying, what's this all about? Why? Why are you detaining me? What's going on? As if defendants had an obligation under Illinois evidentiary law to prove their innocence by making a compliant statement with that. Indeed, the only time that this evidence is usable is if Mr. Pinkett had himself testified. If he had gotten on the stand and said, I was flabbergasted. I was beyond myself with surprise, then the State could have, on cross-examination, gotten up and said, you didn't seem surprised. Did you say anything? And that would be permissible. But because he did not testify, that silence is protected under Illinois evidentiary law. While the State cited to people the Augenbaugh, a 1967 case that examined the tacit admission case. In that case, there must be an affirmative statement, some sort of communication that shows that the defendant is being silent when others would not. So if the officer, Officer Frazier, had taken his arms behind his back and said, you were fleeing, and Pinkett did not say anything in return, perhaps under that circumstance the tacit admission rule might be implicated. This would certainly be a different case and a different analysis. But because the only thing that Frazier told him to do was not make a scene and not to talk, there's no reason that this Court needs to examine the tacit admission rule. Nor is there any reason that this Court should go into the Federal case law, which is not on point and not instructive in this case. This Court has held since 1934 that these cases fall under Rule 401 and that Rule 401 prohibits their admission. Okay. And, Your Honor, simply all I will say in conclusion is that in this case it was not harmless error for Deputy Frazier, for Mr. Pinkett to comply with Deputy Frazier's command, that the jury in this case must have considered the State's implication that he was guilty through his silence. And I ask this Court to affirm 90 years of Illinois precedence and every district in Illinois which has held that a defendant's post-arrest, pre-Miranda silence is inadmissible in these kinds of cases when the defendant does not testify. Unless this Court has any further questions at that, I will conclude. Thank you. Thank you very much. So I understand the facts. Big high-speed chase, lots of police officers following three motorcycles, but then the chase stops and the officers do not continue to follow the motorcycle that it's Right. So there are two cars chasing these three motorcycles. There's Deputy Wassil and Officer Hopps. Wassil testifies that the three motorcycles, including the defendant, the defendant does not dispute the identity at trial, did not dispute the identity. He said, I was on that motorcycle, but I couldn't, or he argued he could not hear the sirens. They accelerate to over 90 miles an hour. Wassil tries to keep pace and is falling behind. One of the Harley-Davidson's then reduces speed, and Wassil and Hopps pull over with that car. The other two then get away. Because there are only two cars. Those two cars are the ones that stopped the motorcycle that pulled over. The reason, to answer your other question earlier about, well, how was it that these two Does the record show how far the Walmart was from when the police officers concluded the chase? It doesn't, Your Honor. I consulted Google Maps for whatever it's worth, and it was not the next turnoff. There was still a stretch. But that was not presented as part of the evidence at trial. But the reason that there were two plainclothes, a deputy and a sheriff, who ended up affecting the arrest, was that after defendant and the other one, Harley-Davidson, had outpaced police, a person in the Walmart parking lot saw defendant tear into the parking lot. He was putting his family into his car. He was startled, and then he saw shortly after police cars pass with their sirens going, so he called a friend of his who was with the state police and said, I think that someone is trying to evade the police based on what I just saw. That state trooper reached out to the sheriff's deputy, and that's why they showed up as they did with sort of nothing on them at all. And then later, after they had radioed it in, you can see from Officer Hobbs' dashboard camera when she pulls in, and they take her from there. There is actually evidence about the speed that he entered into the parking lot, the state of the parking lot. Was it bustling? All of that was on the Walmart surveillance footage that was admitted as evidence at trial, so this court can watch those clips and see whether any of that could plausibly support defendant's argument. But there's certainly no affirmative argument, affirmative evidence, presented as to him having earplugs, having earphones, his ability to hear, anything like that. And that Walmart video shows that there were no sirens behind him, nothing, no noise at the time that he entered that parking lot. Right. As he pulled into the parking lot, that's correct. Shortly after he does, you can see the cars pass with the lights going on the highway on Route 54. But at that moment... Were those the same lights, the same officers after they'd completed the stop with the two Harley? You can't tell from the video which cars those were. So we don't really know if they were going, if those were the same ones or not, right? No. All we know is that he had just been chased by police for over 10 miles, for over 10 minutes. There was no testimony that he ever turned around, correct? I mean, was it the Harleys' turn off because one of the passengers turned around? Well, one of the... We don't know what... There's no testimony about why the Harley pulled off either because if it was the passenger turning around, that was at the stop in Atlas. That was at the four-way stop when Detective Walsall was only 10 or 15 feet behind him at the stop. One of them turns around. And then they proceeded through Atlas, through Summer Hill, through New Hartford, and through Pittsfield. So they went through three more towns before they pulled over. So I would submit that it's not a plausible explanation that the reason that that one Harley pulled over was that three towns earlier one of them had noticed they were being pursued by a police officer. I think it's also important to remember the actual evidence of the silence when we're looking at the possible effect it could have had on the outcome. The evidence of silence was one line. The question was, you know, you talked about walking in from the bathroom to the front. Did he, at that point, when you had detained him, ask why he was being detained? And the answer was, no, not like somebody going to your side and grabbing, in plain clothes, grabbing a knife off your waistband and anything. He didn't act like I was doing anything out of line whatsoever, which to me is odd. Was he under arrest? Yes. At that point, he was under arrest. Now, his failure to show surprise is not evidence of silence. The police are always allowed to observe someone and say he didn't look surprised, he looked mad, he seemed scared, anything like that. So the only evidence of silence is the word, no, in response to, did he, at that point, when you detained him, ask why he was being detained? All of the evidence after that, the walk from the bathroom to the front of the store and afterwards, none of that was silence because he was making statements. And a person, when they are making statements, is not simultaneously, silently invoking their right not to make statements. He was under arrest and hadn't been Mirandized yet. That's right. And people volunteer statements all the time before they've been Mirandized. And those are always admissible because they're not compelled by the State. They've not been induced by the Miranda warning. So, for example, here, he said in the car on the way to the police station, he said, I went to the Wal-Mart to buy zip ties, and he said that he had not been fleeing from police. Those are both admissible because they're just statements that he made before he was Mirandized. He was in custody, but he was not being interrogated, so there was no bar on their admission. Now, a defendant has argued that, as a matter of Illinois evidentiary law, there is 90 years of precedent saying that evidence of silence is categorically inadmissible as a matter of evidentiary rules, and that is incorrect. That argument is based on these two cases from this court, Roth and Leverance. Roth was in the 30s. Leverance was in the 60s and cited Roth. But neither of those cases held that silence is categorically inadmissible as a matter of Illinois evidentiary law. Both of those cases, rather, concerned a defendant's refusal to make a statement at the police station. And in Leverance, it was actually a refusal on the advice of counsel to make a statement. So both of those cases said that that refusal was not probative for exactly the same reasons that the U.S. Supreme Court subsequently said, that you can't admit evidence of silence when someone has essentially invoked their privilege not to make a statement because, one, that's unconstitutional, but, two, it has no probative value because when a person has refused to make a statement, in other words, when a person has invoked their Fifth Amendment or Article I, Section 10 privilege not to answer questions by the police, that invocation has no probative value, and the risk of unfair prejudice is enormous. But Roth and Leverance do not stand for a general proposition that evidence of silence is categorically admissible, or inadmissible, rather. And the courts that have held so have taken that language out of context. Roth said this evidence is irrelevant, where this evidence was the evidence of the refusal to make a statement. Leverance specifically says the refusal has no relevance. Neither of them said that silence in general is categorically irrelevant. And then the last point I would make is going back to the basis for this Court's ruling. Of course, the Court can affirm on the ground that it was harmless, but we do think that it is worth clarifying that evidence of silence is not categorically inadmissible under either the Constitution or as a matter of Illinois law, is simply subject to the same balancing as any other evidence. And in most cases, it will be inadmissible on that ground. But that does not mean that in every instance is inadmissible on that ground. And so for those reasons, unless there are any further questions from the Court, we ask that this Court reverse the judgment of the appellate court. Thank you very much. Thank you very much, Counsel. This case, Agenda Number 4-127, People of the State of Illinois v. Michael Pinkett, will be taken under advisement. Thank you both for your arguments.